On extending the cases that we have scheduled, we will see if we take all three in a row or whether we take a break at any stage, remains to be seen. No particular guidance to experience advocates on what they need to be doing. Obviously, we do have fairly rigid time standards that helps all of us, helps you I'd like to think, but also helps us in moving the cases along, so watch the lights that are there. But you do not need to ask the presider if you can finish answering a question, even if your time's run out. By all means, answer whatever the final question was. First case of the day, NexPoint Advisors v. Pachulski, 22-10575. Looks like Mr. Schwartz gets to start us off. Samuel Schwartz, Athanasios Agalakopoulos on behalf of NexPoint Advisors. Thank you for the time today and the pleasure of appearing in front of you. I'd like to start. You've appeared in this court many times? This is the first time in this circuit, Your Honor. I have been before the Ninth Circuit Court of Appeals several times, but this is my first time in front of the Fifth. So a beautiful court. I hope you haven't been distorted in your advocacy by the Ninth Circuit. Your Honor, I'll try to not let that influence my argument today, recognizing that I am far across the country. With that, Your Honor, I'd like to start with this court's decision in 1977 in First Colonial. And I think it's instructive for us to start there, because First Colonial, this court made clear that when it comes to issues with respect to fees, professionals' fees in bankruptcy cases, fees are different. And the reason fees are different, the issue in this case, NexPoint's opportunity to prosecute objections to professionals' fees, why that's different, is the adversarial system in bankruptcy begins to break down when you talk about professionals' fees. And the reason it breaks down is that the party that has the interest, if you're going to talk about standing, and I know we'll get to that, is the bankruptcy estate. The bankruptcy estate is the party that has standing to object to fees. However, if you take a direct view and not the statutory view of standing, however, the issue with respect to the estate is that the professionals who are seeking to have, the state's representatives, the professionals that are seeking to have their fees approved, have a natural conflict. So first, when you talk about First Colonial, it made clear that the courts have to broaden the playing field of parties who can object to fees because of the natural conflict that exists between the bankruptcy estate and its professionals. So you broaden the field. That then, however, First Colonial really arises under the Bankruptcy Act. That issue becomes crystallized under the Bankruptcy Code with the cause of action that NexPoint moved under, which is Section 330A2 of the Bankruptcy Code, which gives broad standing under Section 1109 to any party in interest to pursue those objections. And I highlight the word any because it's not as if the code says a party in interest. It says any party in interest can lodge those objections. And so I think when the court looks at this case and says, well, what's the issue here with respect to standing? You have to start in 1977. So then, with First Colonial in the background and the legal concept of broad standing, you then have the issues of what we submit was the error committed by the district court. That the district court, when it dismissed NexPoint's appeal of the Bankruptcy Court's decision not to allow NexPoint to litigate the issues with respect to the legal fees, that it applied the wrong standard under COHO. That what the district court should have applied was the standing under Cajun Electric. And this court's decision in Cajun Electric gave really three factors to consider when determining whether a party has standing to bring a claim. Number one, was its property diminished? Were its burdens increased? Or were its rights impaired? Excuse me, Cajun Electric, though, has such different facts. I wonder on its applicability. We have not used Cajun Electric to alter party grieved analysis, have we? I think you have, Your Honor. I think COHO actually cites the Cajun, if you want to start there. So, I think the court has. And Cajun is the earliest case in the line of these cases talking about, in this circuit, talking about how you determine standing and what factors you should consider. And I think when you look at the other cases, whether it's COHO, Technicool, or Dean, I think those cases need to be harmonized with Cajun as you flow your way forward. And when you talk about, how is Nextpoint impaired in this particular case? How are its rights impaired or its burdens increased? Well, we know Nextpoint- What happened in Cajun Electric, didn't the party who was seeking to repeal lose control and had no further role to play and the bankruptcy deed took over? I don't know if that could be seen as a caveat or an exception or just an entirely different situation. That is at least one way to look at it. When you're not looking at financial impact, you're looking at the actual loss of control of one's own company. The impaired right, Your Honor, I think there, that's what Cajun said. Cajun said, the- In that context, though, and you're trying to apply it, it seems to me, in a much different context. I think, Your Honor, I would say no, because I think the Appellees are arguing the context is similar. They argue Cajun had to do with the loss of ability to generate revenue, but that's not what this Court said in Cajun. This Court said the impaired right of losing the ability to run your company, that was the right that was impaired. Even if you were out of the money, that was the right that was impaired. And here, even though the Appellees argue the next point is out of the money in terms of how the fees get implicated, not so much. And I think that's where you come around to Interlogic. Interlogic says if those fee orders go final, that's res judicata, right? And Interlogic talks about if you have objections to- Is it clear that this fee order is res judicata if ultimately your company is found liable for whatever that amount is? It would be res judicata to the reasonableness of those fees, Your Honor, under Section 328 of the Bankruptcy Code. And where that becomes relevant is in the companion parallel adversary proceeding. Next point has been sued over all these fees. It's in excess of a total of 60 million, I think 40 million. How many have been sued in that adversary? Two companies or more, or two parties? There are several defendants in that adversary, Your Honor. I apologize, I haven't counted them. But there are several. Next Point is one of those defendants in the adversary. But if these orders are allowed to go final, the rights of Next Point are impaired today to defend itself against those damages. You now have presage damages Next Point has to litigate against in the adversary. There they are, that's done. I think when you talk about... You're saying you'll lose legal defenses in the adversary proceeding if you can't appeal now? 100%. So if these fee orders... Preclusion? I'm sorry? Preclusion? Preclusion, res judicata, increased burdens, and now we cannot fight the reasonableness of those fees. So to the extent we're being sued for those damages, we no longer can argue like you would see typically in a tort case. You would have liability would usually happen first. You would then get to damages after that and fight about what was the harm caused by the tort once you determine liability. We're in reverse in this particular instance because now when you get to the adversary case, to the extent the fees have gone final, the opportunity... Next Point knows it has objections. It lodged them in the main case. And importantly, Your Honor, the main case is the only place where Next Point can lodge its objections. That is limited by Section 330A2 of the code. It's in the main bankruptcy case. So once those orders go final in the main bankruptcy case, we cannot then challenge them later if we're found to be liable for those fees, if we wanna argue they were unreasonable, they were excessive. To be fair, the professionals, the lawyers in the case, the average billable hourly rates of the lawyers are roughly $1,000 each. So there's a good deal of money at risk here and Next Point is being asked to foot the bill. So to say to Next Point, we want you to foot the bill, but we're not going to let you object to the reasonableness of the fees or any of them on any level at the bankruptcy court cannot be right. And to be clear, Next Point was not allowed to do discovery. It wasn't allowed to pursue its objections. It wasn't allowed to investigate them. That was also error by the bankruptcy court in that Bankruptcy Rule 9014, once there's a contested matter, pulls in the federal rules of civil procedure and Next Point was denied its opportunity to lodge its objections in accordance, by the way, with the bankruptcy court's interim fee order. It was following the bankruptcy court's interim fee order. It was pursuing discovery as it was supposed to. It was following the process as prescribed and then it lost its rights. So I think- Explain how exactly the approval of fees is hurting you, not down the road, not one day in the future, but now. Well, I think, Your Honor, when you look at, there's been a little bit of Rule 28 practice by both parties prior to the hearing. If you look at what the Sixth Circuit just said in Schubert, the Sixth Circuit just said, if there is existing litigation, that's harm. You now have demonstrated that there's harm in front of you and how Next Point is injured today. Its rights are impaired and its burdens increased or that it can no longer litigate those issues in the adversary proceeding. It's done. It can no longer. Its right to object to the reasonableness of the legal fees it's being asked to pay, the damages, are impaired now. Once these orders go final, it can no longer do that in the case where it's being sued. So that's impairment today. And by way of example, let's just talk procedurally. The trustee, Mr. Kirshner, who's the plaintiff in that case, could move for partial summary judgment. As soon as this order goes final, it could move for partial summary judgment in that particular case and say, there's no dispute, the legal fees are final. To the extent we're successful on damages, this issue is resolved. So I think there, Your Honor, we would be facing procedural hurdles that we could not get over because we were not allowed to litigate the fees in the main case. And that's over. That would be impairment at that moment right now. So that, Your Honor, is how I would suggest it's not, this isn't speculative, the harm is here. I don't think that the plaintiff in that case is going to argue that he doesn't believe his claims are good or that they are proper or righteous. So, and we're colorable. So from that, we have to be here now. And I think that's back to Intellogic where this court made clear, if you recall in that case, there were known objections to Ernst & Young's fees in that case, but the board of directors elected not to lodge those objections at the fee hearing because they thought they would sue Ernst & Young for failure to give a good audit later. Well, when the company, the debtor in that instance, Intellogic decided to sue the Ernst & Young for its alleged bad acts and some audits that it did, the circuit said, no, no, no, no, no. You have to lodge your objections when you know you had them, in particular when the fees are being requested. You failed to join the action then, failed to do it at that point in time, you lose those rights later. You don't get to then go sue them when you didn't object to the professional, when you didn't object to their fees at the outset. We're in the exact same place. We must object to the fees today. If we don't get our day in court with respect to the fees, we lose the right later. That's harm right now. That's immediate impairment to our rights and that is increasing our burdens in the companion case. So there is the distinction and I think this court's precedent has made clear. Fees are different. I think Cajun Electric is the standard. I think this court has not overruled it. The appellees are not arguing that Cajun should be overruled. They're not arguing that it's bad law. And so when you look at those cases in tandem, I think not only does Nextpoint meet the COHO standard or the Intercool standard, but I think the right application, if that's where the court's going to go, is Cajun. Then I think if you're going to look at the next layer of standing, if you're going to get through the person aggrieved aspect of things, I think you look at some of what has been argued here in terms of whether prudential standing, as the appellees are arguing, does it apply? We would argue it doesn't. You have a cause of action that's created under Section 330A2 of the Bankruptcy Code. You have a class of claimants that Nextpoint clearly falls under, under 1109. So we would submit to the court that Lexmark makes clear that you don't apply prudential standing when you have a clear cause of action and a class of claimants that falls within that claim, and that is Nextpoint. So I think Lexmark applies here to the extent the court's going to consider prudential standing. I think the district court put it well when it said, really reframed in the motion to dismiss, reframed the appellees' arguments as opposed to constitutional arguments and those of mootness into what we're really arguing about today, which is prudential standing. But if mootness is something that the court's going to consider, given the amount of money potential aspects Nextpoint may have in connection with how the flow of money may go as a result of the fees, I think back to the Rule 28 practice, we have put in front of the court the Mall of America case that the Supreme Court just issued, which had to do with jurisdiction in bankruptcy cases, and there Judge Jackson made clear mootness really shouldn't apply when the court can issue a ruling, no matter how remote the harm may be, that it can give redress. And here, this court can give Nextpoint redress. It can give it its opportunity to litigate the professional case.  about whether you have actually presented this argument, the alternative argument on occasion, or that the order diminished its property, increased its burdens and impaired its rights. Now it's the opposite to say that you didn't present that to the lower court. Well, I think that's the waiver argument, I think, Your Honor. So first, I would submit, no, that, first of all, the appellees never raised this argument. You have to actually look at what the district court said. And the district court said they framed their arguments in constitutionality and mootness. They never raised those issues, number one. Number two, we're here on- My question is, did you raise it? Well, so in our, first of all, the bankruptcy court never held that Nextpoint didn't have standing. So that wasn't an issue at the bankruptcy court level. You didn't raise it. So not at the appeal stage, Your Honor, because we were there saying we didn't get our rights to litigate. Standing wasn't an issue. Your argument's there, but my question is, did you raise it to the lower court? We raised it in the lower court of the bankruptcy court, and it was agreed we had standing in the bankruptcy court. Nobody disputed that. In the district court, that issue wasn't an issue on appeal, was we were the appellants. We didn't raise standing because it was found we had standing at the bankruptcy court level. The motion to dismiss was in constitutionality, Your Honor, and the appellees didn't raise it, Your Honor. So I think from there, where you're talking about waiver, if that's essentially where you're headed, the issues didn't come up in the way I think the court is suggesting. And the way the appellees are now raising it, they didn't raise it either, Your Honor. And we're talking about motion practice where we had seven days to respond to that motion. We hit that nail on the head, Your Honor, as soon as we had a chance to brief it. And I would say here, you have exceptional circumstances if the court is considering waiver. This is a pure question of law. Applying Cajun would be the right standard, and it would be, I think, manifestly unjust, Your Honor, to throw next point out on an argument of waiver when the way the issue came before the court isn't the way that the court was concerned with. Again, it wasn't an issue at the bankruptcy court level. It wasn't an issue the appellees raised. It's something they've raised now at this court's level. So I think their waiver is a bridge too far. I know I'm out of time, so. All right, thank you, Mr. Schwartz. Thank you. I'll hear from you shortly. Before you start, as a matter of full disclosure, Mr. Krupp and I had a brief conversation early this morning on the elevator. I believe it was. I was dressed differently at that time, but I told him he looked dressed ready for battle, and he responded the same to me. That is the extent of our contact. It is indeed, and I did not know that it was you, Your Honor. I frankly didn't know you from anybody else on this planet. So thank you for that, and I appreciate that. Good morning, and may it please the court. I have, but first I should apologize. If I was doing a lot of wheeling back there and didn't mean to be distracting to the court, I'm having a little trouble hearing. I have hearing aids turned all the way up, but we'll do the best. I can hear you now. Back here was not so great. Before I begin addressing the arguments that appellant's counsel offered to this court this morning, I was hoping to spend a moment to just simply give this court a little bit of larger context of why we are here. And we are here again. For those keeping score, and at least we are, this is the fourth, this morning's the fourth, in a few minutes we will hear the fifth, of 12 appeals that these affiliated entities, all owned by James Dondero, have brought into this court from this one bankruptcy case. They have prosecuted, so far, more than 30 appeals to the district court. And other than a procedural win where the district court remanded something back to the bankruptcy court for a more definite statement, they've lost every single one of those appeals. And when they lose in the district court, they come here. So we are here now on the fourth and fifth appeals of 12 so far. It is important, I think, for the court to appreciate that because we have a litigant standing before this court asking this court to do rather extraordinary things and walk away from, or at least deviate significantly from decades of jurisprudence that if applied straight, would simply disqualify and make a easy question and give it an easy answer. Does this appellant, which is not a creditor, which is not a claimant, which is not a beneficiary of the claimant trust that was established by the Highland Plan of Reorganization, whether they have standing? The answer is a clear no under this court's standards. And- I have a couple of questions about that. One is, even an overly aggressive litigant can occasionally be right, and that's what we have to decide here. So I start with the problem, and I'm wondering to what extent the lower court was already somewhat frustrated with your friend on the other side, because it does seem to me that the objection is being made now, he was invited to preserve by the interim compensation order that says the filing or failure to file an objection will not bind any party in interest if you want to wait until later to make them. And, well, I mean, I do have another question to follow that. Respond to how that should affect our analysis of what happened in the lower courts. Well, Your Honor, I think it's important to bear in mind that underneath this entire question is an important philosophical question about the way that our federal courts deal with bankruptcy cases. So let me, if I can, explain how that works. In the lower court, Your Honor is exactly right, that their argument is, well, there were these interim fee approvals during the course of the bankruptcy case. There's nothing unusual about that, as I think Your Honors can appreciate. That is a fairly commonplace event in large Chapter 11 cases. And because those interim fee applications were, the stakes are very low on those. And it is not unusual for litigants to reserve whatever opposition they may have to fees until those fees are now before the bankruptcy court on a final basis at the end of the case. That's what happened here. Your Honors, a few moments ago, asked Mr. Schwartz whether or not he had an opportunity, and he stood in front of you for several minutes trying to persuade this court that Nextpoint did not have an opportunity to object to the fees at the final stage in the bankruptcy court. It is an unfortunately inaccurate answer that Mr. Schwartz gave you. Nextpoint absolutely did get an opportunity to oppose those fees. And the bankruptcy court considered that opposition, considered the objection, and ruled against it on the merits. That was their shot. Implicit in all of this, and this is what I think I spoke of a moment ago when I said that there is something that is peculiar about the way federal courts deal with bankruptcy cases. And that is there are circumstances, and they are not rare, where there is a litigant who is given an opportunity to be heard, and we heard why. It's a reference to Bankruptcy Code Section 1109. 1109 is very broad. It gives lots and lots of parties the ability to be heard in a bankruptcy court on a great many issues. And we have heard sort of implicit and sometimes explicitly from these appellants, well, how could it be just, how could it be right that a litigant can be heard on an issue in the bankruptcy court, lose, and then not have the ability to have their arguments and their merits of their arguments considered on appeal because of prudential standing principles that get applied to them only after they leave the bankruptcy court and go to the appellate court? How can that be right? The answer, respectfully, is it is right. That is just simply the way that we do it. And we do that for lots of very good reasons, to put a fine point on it. To my initial concern, and you said that regardless of the somewhat negative comments, perhaps, by the bankruptcy judge to the other side and that they had waited, that they did get a full opportunity to explore their objections before this became final. The other question I have, at least at this stage, let's say it was backwards, that it was already determined that, backwards, but in a different order, it was already determined the next point is going to have to pay some of the attorney's fees. Would they have standing to, that would give them standing to be appealing now, wouldn't it? What I'm trying to get to is, is it inevitable? I mean, the party agreed, maybe, the standard we end up continuing to apply. That's part of what's being brought to us. But if we do, I'm wondering about how, when does speculative become more than speculative and become certain? If, in fact, it is clear, ultimately, the next point is going to be one of those who's going to have to pay some of this $40 million. Well, Your Honor's referring to something that the district court judge below, Judge Kincaid, called extremely remote. He called this extremely remote because, when he began to consider what would need to happen in this adversary proceeding that we're talking about, there is a current adversary proceeding pending in the bankruptcy court. Next point is one of approximately 10 or 11 defendants, that all those defendants are all affiliated with one another. And Mr. Dondero, for what it's worth, is also a defendant in his individual capacity in that adversary proceeding. And I think what's important to bear in mind is something that Judge Kincaid below did appreciate. Because, if I may, let's talk about what possibility, and that's what the appellants have called this, it is a possibility that they may ultimately be saddled with some sort of judgment that includes some fees from the bankruptcy case that they then don't get to argue against now because they lost before. But we always talk about, in any type, no matter how the standard is expressed, whether it's Cajun Electric or Judge Willett's opinion in Technicool, or whatever it is, we always talk, sorry? Like his, don't you? Your Honor, it's not a matter of liking or disliking. It was simply, I do happen to like Judge Willett's expression of the, I like the writing and I like the ability to use the word sclerotic. But suffice it to say that the standard has been the standard. And yes, was it expressed differently in Cajun Electric? It sure was. But the words might be different, but the result is the same. This court and every circuit court that applies the exact same person of grief standard always looks at concrete things, a direct adverse pecuniary effect, direct. That's not what we have here with this adversary proceeding. Here's what has to happen for that to happen. If the litigation subtrustee, who I'm speaking of, if the litigation subtrustee pursues that litigation against this particular defendant, and currently there is no direct claim in that case against Nextpoint, the counts on the complaint, I don't believe is in the record. So this is simply rhetorical. But I want the court to appreciate that Nextpoint has sort of related claims. So there is alter ego claims against Nextpoint. But the thrust of the merits are against other defendants. Now, if the litigation subtrustee pursues the litigation against this particular appellant, if this appellant loses that litigation, if a judgment is entered against this appellant, if Nextpoint is found to be an alter ego of Mr. Dondero, if that judgment, which is a fraudulent transfer and alter case, and we've heard nothing from this appellant that would indicate that that would ever happen, if the appellant is somehow foreclosed from arguing against the reasonableness of including those fees in the judgment that may never happen, and if that judgment is ultimately upheld in the inevitable appeals to the district court, to this court, many, many years from now, if all of those things happen, then maybe this appellant can say that the finality of the bankruptcy court's fee order could conceivably, possibly affect this appellant financially. This is preposterously remote. Whatever you can say about all of that long list of ifs cannot possibly be the type of direct pecuniary effect that this court and every other circuit court of appeals in the country requires for prudential standing. And it should be noted, by the way, that everything I just listed, as being a possibility, gets more and more and more remote the more things you add to that list, but I need to add one more, and that is that that litigation is currently stayed. It stayed for at least six months, and it was stayed because the litigation sub-trustee basically told the bankruptcy court, we may never have to pursue this claim. So as we stand here, which this court simply has to deal with the reality that we have before us, respectively, and does not have the luxury of looking into the what ifs that may appear in somebody's crystal ball, today, this is a piece of litigation that has not begun in earnest, is currently stayed, may be forever stayed, who knows, and all of those ifs that I just rattled off are only the ones that I could think of. Here's another, here's a what if question. If we hold the next point lacks standing, is Mr. Schwartz correct that preclusion will bar all their defenses in the adversary proceeding? I have no idea. What I do know, because I may have been born at night, but not last night, is that this side will fight tooth and nail to prevent such a preclusion from ever happening. If at some point, in some way that's very difficult, respectfully, for me to conceive of, that fees from the bankruptcy case would be included in the damages against an alter ego of Mr. Dondero, in that litigation, if it were ever litigated, if the stay is lifted, if it moves forward, all those ifs that I rattled off. And now they're faced with a potential argument from the litigation sub-trustee that says, oh, no, no, no, Mr. Schwartz, next point does not get to argue about the reasonableness of the fees, because that's raised judicata. That's a position, that's a legal position. I have no idea whether that legal position will prevail. And frankly, I don't think Mr. Schwartz would like to stand before you and say, we're definitely going to be precluded. I'm going to lose that argument when it comes up in some indeterminate point in the future in that litigation. I'm going to lose it. He's certainly not going to argue that that's a dead loser for him. And since I don't know, and he doesn't know, and quite respectfully, neither does this court know, what would really happen when that is actually litigated as a matter of law, as a matter of jurisprudence? Who knows? But these what ifs, and Judge Willett, you were absolutely correct to call this a what if question. But we keep adding what ifs to a situation where we keep having to keep our eye on the ball. And the ball is, do we have an actual direct pecuniary harm today to allow this court to have, to allow this appellant to have prudential standing to have its complaints heard in this court? Have you had a chance to review the 28J that Mr. Schwartz filed recently? Yes, Your Honor. There was actually two that Mr. Schwartz filed. I'm just talking about the one that seems to assert that the Mall of America case abrogated or has some limiting effect on the person aggrieved test. Yes, I have had an opportunity to consider that argument. I think it's important to bear a couple of things in mind. First of all, that case, it shouldn't surprise this court, that case had literally nothing to do with standing, mootness, prudential standing, which, and I know the court appreciates the difference between constitutional standing, which is a question we ask under the cases and controversies clause of the Constitution, and prudential standing, which, of course, is a prudential standard that, right now, all of the circuit courts in the United States follow. The 363M case, which is this Mall of America's case, Justice Jackson's opinion was a very well-written opinion and was very clear about what it was that the court was talking about and what it wasn't talking about. And one looks in vain in that decision for any discussion whatsoever about standing, whether it's constitutional standing or prudential standing. That word just simply doesn't appear in that opinion, and it isn't even intimated about. Why? Because the issue in that case had to do with what kinds of substantive relief can an appellate court give when the appeal pertains to an order that approves a sale of assets in a bankruptcy court. Congress has said there is a limit to what the substance of what an appellate court can hear and give relief based on, and that limit is, whatever it is that you do, appellate court, you just can't undo the sale itself. Why? Because there are lots of very good and very obvious practical reasons for finality in bankruptcy sales. These sales are good for the economy. They are good for the bankruptcy system to operate in. So because of that, Congress said, look, whatever it is that you want the appellate court to hear. And there are many other issues that could be heard on appeal of a sale order. Sale order can include provisions that have to do with where the sale proceeds go, who has priority to what dollars from that sale. But as long as you're not disturbing the core fact of the sale, you're not undoing the sale to this good faith purchaser, that's all that that is. And the Supreme Court did something rather extraordinary, rather ordinary, frankly. It's perhaps why this particular Supreme Court ruled unanimously on this issue. It's because we're not talking about jurisdiction. We're not talking about depriving the appellate court of hearing the case at all. This is Congress saying, whatever it is that you do substantively, whatever the merits are of this appeal, you can consider it as long as the relief you grant on appeal doesn't undo the sale that took place. So it had nothing to do with constitutional standing or prudential standing. The other thing that's important to bear in mind is we heard from this appellant, both in briefing and this morning, that Lexmark, which is a much earlier Supreme Court decision, that Lexmark somehow affects the prudential standing requirement. What's really, I think, most relevant to bear in mind there is something that this court said in a case called Superior MRI Services. And in Superior MRI Services, which was not all that many ago, it was just a few years ago, this court had this to say about Lexmark and about Lexmark's effect or no effect on the person of grief standard. This court said, we are bound to follow our precedent regarding the person of grief standard until the Supreme Court squarely holds to the contrary. The Mall of America's case, whatever can be said about what did or didn't go on in that case, that no one could, with a straight face, stand in front of this court today and say that that case is the squarely contrary holding that this court is waiting for from the Supreme Court about the vitiation of the person of grief standard. That is not what happened in Mall of America. And that's why I think that, despite a good effort, that case does not inform this one at all. And frankly, neither does Lexmark. I think the last thing I wanted to add very briefly, and I have one more minute and I can do it in a minute, is to address the issue of Cajun Electric and specifically address, because I think you heard that I'll simply repeat this for the court, and that is no matter how the person of grief standard is expressed, whether it includes the statement that, oh, somebody's rights are affected, or there's been a deprivation of an ability to do something. Well, yes, that was a standard in Cajun Electric, having to do with something, by the way, that I think is important to bear in mind. Cajun Electric, as this court already recognized this morning, was about the Chapter 11 debtor in possessions loss of the ability to operate its company. That was a definite thing that happened to them. Definite thing that happened to them. It was not a possibility. It was a definite loss of things. Instead, by comparison, we're talking, as I mentioned before, about simply a list of possibilities, a long list of what ifs. There was nothing if about the loss of the debtor's business in Cajun Electric. Finally, Judge Higginbotham, you did ask Mr. Schwartz a very direct yes or no question. Mr. Schwartz did his very best to not give you the answer. The answer, of course, is no. They did not raise this in the district court. We believe without question that the entire Cajun Electric argument has been waived in any event. Thank you, Your Honors. All right. Thank you. Your Honors, I'd like to start with Cajun Electric quickly. And in that case, recall this court said the loss of the right of a company to run itself is impairment. In this case, you hear all the time, I think, that this is how the appellees argue. James Dundarrow, the principal behind many of these entities, or the manager, is litigious. Well, Mr. Dundarrow lost the right to run his companies, in particular, these debtors. And he's been fighting like hell ever since. And I think what's ironic about that argument is when you come around to the final hearing on the fee applications, Mr. Krupp is right. There was a process. There's interim applications, and away you go. And all rights are reserved for the end. So the one time that everyone wants to talk about Mr. Dundarrow wasn't litigious, and waited until the end, like the process is supposed to operate, there's the gotcha. Oh, well, you could have been doing this throughout the case. And you had all these opportunities to object to the interim apps. But you didn't. And now you lose. And I think there, again, The court was indicating that, indeed, the bankruptcy judge did consider the arguments that were then made despite this sort of throat clearing that said, I wish you hadn't waited. You disagree with that? I do, Your Honor. OK, we'll just have to look at the record and see. Just to be clear, what we were denied was our opportunity to discovery. So we lodged objections. Yes, you did get the discovery. But the judge did listen to your arguments and denied your objection. We filed objections, Your Honor, correct. And we did argue. And what the bankruptcy court denied us was our rights under Rule 9014 to conduct discovery and to provide the evidence that we thought we'd be able to do through that process to bolster the objections. So I think that's a bit of a twist as well, Your Honor, in that, yes, that's how you do it. To create a contested matter, objections are lodged. Then you go to discovery. The objections were considered, but just not as fulsomely as you would have enjoyed if you had had discovery. I don't think they were all fulsome, because we weren't able to provide the evidence that we were entitled to under the rules. And we waited till the end to do that. And again, we were talking at the time of $60 million of fees that we've narrowed to 40 that are on appeal. I want to be clear. The waiver argument, Your Honor, that issue about the adversary and what was being argued was waived with respect to Cajun. This comes up again in motion practice. And they raised it in their reply papers to our opposition to their motion to dismiss. I think waiver is not here. I think it's important for the court to keep that in mind. I think, Your Honors, I'd like to end where I started, which is with First Colonial. And I think First Colonial, back 46 years ago, this court made clear, when you talk about fees, fees are different. There are conflicts. There are issues between the estate professionals and the party that benefits from the objections, the bankruptcy estate. And so when you talk about who's going to bring these types of objections, who's going to bring these types of claims, it is exactly the next point type of parties that are going to bring them. Because if not, there's no incentive for the professionals to lodge these kinds of appeals. It's their fees that are at issue. So as this court noted in First Colonial, the field has been broadened. And the field has been broadened because it needs to be. And so as you look at some of the arguments that come up and you talk about Mall of America, the Supreme Court's case, that is a jurisdictional case. It is a case that discusses jurisdictional rules, that makes clear that the jurisdictional rules are subject to a clear statement, that standing is a jurisdictional doctrine. And what Judge Jackson said in that particular case was that a case remains live as long as the parties have a concrete interest, however small, in the outcome of the litigation. And it becomes moot only when it is impossible for a court to grant any effectual relief, whatever, to the prevailing party. And here, that's our submission. There's not been waiver. First Colonial makes clear we're in the class of parties that it was intended would have standing to object to fees. And given that we have a concrete interest and that we're being sued for those fees, that interest, however small this court may think it will be, in the outcome of that litigation, isn't moot because this court can fashion a remedy. I thought that what you did is you waited to the end and then asked the court for discovery and to re-examine these fees. And Judge Kincaid, who is a veteran in this business and a very able one, made it up. It was throat clearing because you went on. But he made, I think, an astute observation that it doesn't work this way, that you see these fees that are there, and you don't do anything about them. And then you wait to the end, and then you want to start another whole proceeding to object to those fees. And of course, what he is expressing is the trial court's normal understanding of that. That frustrates the processing of the whole matter. That does cast the question of the person aggrieved here in the right light, I think. It's not determinative, I think, but it sure frames the question of whether you really have any injury or not. You don't do anything. You wait to the end, and you say, well, let's look into it and see if I do. And that was his observation. It doesn't work that way. Well, understood, Your Honor. I think that it doesn't work that way. It makes me wonder whether you really this is an afterthought that you had to wait to the end of the fees, and then we're going to raise those matters. Your Honor, I would submit, number one, not an afterthought. This is bankruptcy practice. You typically wait until the end to see how is the case shaking out? How are parties being paid? It may be, ultimately, the recovery of assets that come through a plan may obviate the need to litigate the fees. So there is a counterargument that it is wholly speculative. Well, but there's a reason the practice waits until the end to do it. And we're not talking about protracted litigation where we expect things to go on for a year while you go through discovery. It was to provide next point with the opportunity, the fair opportunity, as the rules set up and the interim order set up, to say, we'll do this at the end. Let's see how the case shakes out. And to say, to have a gotcha at that point when we waited, and say, we're not even going to give you limited discovery at that point in time so you can prove up your arguments, and then the counter side of it holds you liable for the fees and the adversary or bring claims there, I think that's where our rights are impaired. I think interlogic tells you that we had to lodge the objections at that point in time. Or we lose them to the reasonableness of the fees. And at that point, as you get to the end. As a first degree, what discovery did you need to find out what your injury was? Well, so next point believed that there were improper activities that were taken on by the professionals and that were not beneficial to the estate that would have brought down the amount of the claims and would have reduced the potential damages that next point was facing. But often, time entries are thoughtfully crafted in bankruptcy because you do not want to waive attorney-client privilege-related matters, Your Honor. So as a bankruptcy practitioner, I can tell you we're very thoughtful about our fee applications to alert parties to what we're doing, but not to get into the details like you might give a client because you don't want to waive any particular confidential type information or secrecy. So there, Your Honor, we thought it was important. And again, this is the practice in bankruptcy. We do this all at the end, and it's common. So I think there, next point's rights were certainly impaired. All right, counsel. Thanks to both for bringing your argument.